Opinion by Judge REINHARDT; Dissent by Judge CALLAHAN.
OPINION
REINHARDT, Circuit Judge:
At the age of 63, Joel Dreyer experienced the onset of frontotemporal dementia, a degenerative brain disorder that causes changes in personality and behavior, impairs social interactions, and causes disinhibition and a loss of insight and impulse control. He was a practicing psychiatrist at the time. From the age of 66 to 69, despite having no criminal history, Dreyer participated in a conspiracy to distribute controlled substances, and in December 2010, at the age of 73, he was sentenced to ten years imprisonment after he pleaded guilty to charges related to that conspiracy.
At the sentencing hearing, the district court was provided with three expert reports: all three diagnosed Dreyer with frontotemporal dementia and noted that he exhibited textbook manifestations of the condition since its apparent onset in 2001, three years before his participation in the controlled substance conspiracy, and that his symptoms persisted into the present. Dreyer did not allocute at sentencing and defense counsel informed the court that his client would not address it due to the dementia’s effect on his behavior. Defense counsel did not move for a competency hearing and the district court did not order a hearing sua sponte. The court sentenced Dreyer to 120 months. Dreyer appeals his sentence, contending that the district court erred by failing sua sponte to order an evidentiary hearing to determine his competency at the time of sentencing.
We hold that the record before the district court at sentencing was sufficient to cause a genuine doubt as to the defendant’s competence and that the court committed plain error by failing to order a hearing sua sponte. Accordingly, we vacate Dreyer’s sentence and remand for the district court to evaluate Dreyer’s competency on the basis of an evidentiary hearing. In light of the additional circumstances of this case, we also direct that all further proceedings be assigned to a new judge on remand.
BACKGROUND
Dreyer experienced a medical emergency in 2001 that coincided with the onset of frontotemporal dementia. Immediately after being released from the hospital, Dreyer’s family noticed significant changes in his personality and behavior. Within a few years Dreyer ended his previously-happy marriage to his wife of 17 years, engaged in uncharacteristic behavior and withdrew from his family to such a degree that friends and relatives concluded that he was exhibiting early signs of dementia.[1] *806 Despite the family’s concerns, his illness remained undiagnosed. In 2004, the 66-year-old Dreyer, a licensed psychiatrist, began providing prescriptions of oxycodone and hydrocodone to patients outside of the usual course of professional practice. In -2007 Dreyer was indicted on: charges related to his participation in a conspiracy to possess and to distribute controlled substances. Although Dreyer had. difficulty recognizing or admitting that his actions were inconsistent with professional standards of conduct, he nonetheless pleaded guilty in September 2009 to two counts of the thirty count indictment.
Prior to sentencing, Dreyer submitted three different expert reports to the court, all of which diagnosed him as suffering from frontotemporal dementia.[2] Two of the reports were obtained from experts hired by the defense, while the third expert was selected by the government but jointly commissioned by both parties. All three reports were consistent in their diagnoses and descriptions of Dreyer’s symptoms. The joint report authored by the expert recommended by the prosecution, Dr. Martell, noted that Dreyer exhibited “behavioral disinhibition, frontal lobe cognitive dysfunction, memory impairment, loss of smell (anosmia), impaired word-finding ability (dysnomia), hypersexuality, loss of tact and social propriety, and lack of insight into his own impairments (anosagnosia).” The Martell report noted.that Dreyer’s affect was normal and that he retained the ability to articulate, but that he suffered from “moderately severe impairment” in three areas of brain functioning: executive control, language, and memory. The report also stated that this condition affected his behavior and ability to communicate, as well as his ability to regulate his speech appropriately or to have insight into his own behavior.
Doctors Amen and Krause authored one of the two reports commissioned by the defense (“the Amen/Krause report”). Their report included brain imaging results showing “extensive frontal lobe damage” causing “his judgment [to] be severely impaired and his insight also impaired.” The results of their neuropsychological testing similarly “revealed deficits that are consistent with Frontotemporal Dementia,” which “affects the part of the brain that regulates comportment, insight and reasoning.” Dr. Rudnick, the author of the final report, also concluded that Dreyer suffered from “impaired judgment, disinhibition and impulsivity that ... rendered him vulnerable to acting rashly and without consideration of the consequences.” He stated that Dreyer’s history reflected a “textbook description of [frontotemporal dementia],” which “presentís] in the early phases with behavioral and personality changes, with cognitive deficits appearing later.” Rudnick reported that Dreyer’s “verbal output was laced with inappropriate sexual references, profanity and facetiousness [and] [h]e exhibited impulsivity in his responses, disinhibition and *807 expansiveness to the point of grandiosity.” Despite Dreyer’s propensity for falsehoods and exaggerations, the doctor stated that “any distortions are the result of his faulty judgment, insight and recall rather than intentional misrepresentation.” Rudnick concluded by noting the degenerative nature of the disease. He observed that frontotemporal dementia is both “irreversible and progressive,” and that Dreyer’s “long-term prognosis is quite dismal,” with an average life span of 3.4 years from the time of diagnosis and a diminishing ability to live independently in the interim.
The evaluations of the four experts consulted were substantially similar, and the reports explicitly disagreed only in their conclusions about Dreyer’s competency. Martell’s report specifically opined as to whether Dreyer was incompetent when he entered his guilty plea. Martell concluded that he was competent at the time of his plea and had taken “full responsibility for having engaged in improper prescribing practices.” When he considered Dreyer’s mental state at the time of the offense, however, he acknowledged that Dreyer “engaged in the behaviors for which he has plead guilty while suffering from Dementia and an organic personality disorder that rendered him disinhibited, and impaired his judgment,” and that this fact “may mitigate or reduce his culpability ... as his moral compass was effectively compromised by brain damage over which he had impaired control.” The Amen/Krause report came to a contrary conclusion as to Dreyer’s competency: it concluded that the dementia “caused him to engage in activities that he may not have clearly understood such as in the plea agreement.” Rudnick’s report did not offer any explicit conclusions as to Dreyer’s competency, but stated, consistent with the other reports, that “his dementia prevented him from accurately critiquing or monitoring his own behavior and from foreseeing its consequences,” and that throughout' the time that he engaged in the activities for which he was being prosecuted, Dreyer “was truly convinced that his actions did not constitute professional violations.”
All three expert reports were submitted to the court prior to Dreyer’s sentencing hearing in December 2010. The presentence report recommended a sentence between 188 and 235 months, and the government requested a sentence of 121 months. Dreyer’s attorney argued for a sentence of probation due to Dreyer’s deteriorating health and the fact that his unlawful conduct was precipitated by the onset of a disease that substantially impaired his ability to make decisions and differentiate right from wrong. Explaining the effect of frontotemporal dementia, counsel stated that “[t]his disease takes people, and it doesn’t rob them of their intellect, it robs them of their moral compass.” He equated the proposed 121-month sentence to a death sentence for the then-73-year-old Dreyer, due to the progression of the disease and unfavorable prognosis.
Dreyer did not speak on his own behalf at sentencing. His attorney explained his decision to direct Dreyer not to speak as follows:
My client isn’t going to speak today because one of the characteristics of the disease is that I don’t know what he’s going to say. He could speak inappropriately. He could make denials. He could accept responsibility, then not accept responsibility. That’s also a characteristic of this disease.
Counsel went on to ask for mercy on Dreyer’s behalf, asking the court to “understand that Dr. Dreyer is partially with us, partially not with us, and that’s why he’s not speaking. I can’t even imagine what he would say to you, Your Honor, and I can’t even imagine what his perception of the truth is in 50 percent of the cases.” *808 After defense counsel presented his argument on behalf of Dreyer, the district court fulfilled its obligation to personally address the defendant. In response, Dreyer stated that he respected the judge and appreciated her comments.
The court sentenced Dreyer to 120 months and made a recommendation to the Bureau of Prisons that Dreyer be housed at the federal medical center in Rochester, Minnesota. Dreyer appeals his sentence contending that the district court erred by failing sua sponte to order an evidentiary hearing to determine whether he was competent at the time of sentencing.
DISCUSSION
I.
The district court has a statutory duty to “order ... a [competency] hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.” 18 U.S.C. § 4241(a). “On review, [the] inquiry is not whether the trial court could have found the defendant either competent or incompetent, nor whether [the reviewing court] would find the defendant incompetent.... Rather, the record is reviewed to see if the evidence of incompetence was such that a reasonable judge would be expected to experience a genuine doubt respecting the defendant’s competence.” United States v. Marks, 530 F.3d 799, 814 (9th Cir.2008) (alterations in original) (internal citations and quotation marks omitted). Here, the district court committed error by failing to order a competency hearing sua sponte despite a record that raises a genuine doubt that the defendant was incapable of assisting properly at the sentencing proceeding.
Alleged errors that are unobjeeted to in the district court are generally subject to plain error review. United States v. Olano, 507 U.S. 725, 731-32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). We have explicitly applied the plain error standard in our review of the district court’s failure sua sponte to order a competency hearing. Marks, 530 F.3d at 814; United States v. Fernandez, 388 F.3d 1199, 1250-51 (9th Cir.2004). But see United States v. Mitchell, 502 F.3d 931, 986-97 (9th Cir. 2007) (not subjecting the trial court’s failure sua sponte to conduct a competency hearing to plain error review). “Relief for plain error is available if there has been (1) error; (2) that was plain; (3) that affected substantial rights; and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings.” United States v. Cannel, 517 F.3d 1172, 1176 (9th Cir.2008). As a practical matter, a district court’s failure to conduct a competency hearing on its own motion will always be subject to plain error review. This is because a defense counsel who is attuned to his client’s mental condition and recognizes that the defendant’s competency is in question would not leave it up to the district court to order a competency hearing sua sponte, rather, he would move for such a hearing himself. If his motion was denied we would then evaluate the district court’s denial of the motion rather than its failure to order a hearing sua sponte. See, e.g., United States v. Duncan, 643 F.3d 1242 (9th Cir.2011). Therefore, the question currently before us, whether the district court’s failure to order a competency hearing sua sponte, will always be raised for the first time on appeal.
If we find that “evidence of incompetence was such that a reasonable judge would be expected to experience a genuine doubt respecting the defendant’s competence,” Chavez v. United States, 656 F.2d 512, 516 (9th Cir.1981), then the first two *809 prongs of the Olano test are satisfied, leaving the questions of substantial rights and fairness. One of the foundational principles of our judicial system is the belief that an individual should neither be allowed to stand trial nor have his sentence carried out if he is incompetent. E.g. Drope v. Missouri, 420 U.S. 162, 171-172, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (“Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial.”). Allowing a judicial proceeding to continue when there is genuine doubt as to the competence of the accused plainly implicates the substantial rights of the accused and seriously affects the fairness, integrity and public reputation of the judicial proceedings. Thus, while we must subject Dreyer’s claim to plain error review, the analysis is ultimately reducible to the question of whether “the evidence of incompetence was such that a reasonable judge would be expected to experience a genuine doubt respecting the defendant’s competence.” Chavez, 656 F.2d at 516. Where the answer is yes, the failure to order a competency hearing sua sponte is plain error.
II.
Here, we must determine whether the district court had before it sufficient evidence to create a bona fide doubt as to Dreyer’s competency. “Competence is defined as the ability to understand the proceedings and to assist counsel in preparing a defense.” Miles v. Stainer, 108 F.3d 1109, 1112 (9th Cir.1997) (citing Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam)). “[T]he competency right does not end at a conviction,” but rather persists through sentencing. Duncan, 643 F.3d at 1248; U.S. v. Ahrendt, 560 F.3d 69, 74 (1st Cir.2009) (“The obligation to determine competency to stand trial is continuing, and persists throughout a proceeding including through the sentencing phase.”); see also 18 U.S.C. 4241(a) (noting that the inquiry into a defendant’s competence may take place “any time after the commencement of a prosecution ... and prior to the sentencing of the defendant.”). The record raises a question as to the defendant’s competence if there is substantial evidence that, due to a mental disease or defect, the defendant is either “unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.” United States v. Friedman, 366 F.3d 975, 980 (9th Cir.2004) (emphasis in original) (quoting 18 U.S.C. § 4241(d)) (holding that the district court properly found the defendant incompetent where he was able to understand the proceedings but not capable of assisting properly in his defense). Although the level of competency mandated by due process does not vary based on the specific stage of the criminal proceeding, Godinez v. Moran, 509 U.S. 389, 400-01, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), the defendant’s ability to participate or assist his counsel must be evaluated in light of the type of participation required.
“Sentencing is a critical stage of the criminal process,” Boardman v. Estelle, 957 F.2d 1523, 1525 (9th Cir.1992) (citing Mempa v. Rhay, 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967)), and the defendant’s allocution, “is an essential element of a criminal defense.” Id. at 1526. Competence at sentencing therefore requires, among other things, that the defendant be able to assist in his own defense by participating in his “elementary right” of allocution. Id. at 1527 (quoting United States v. Behrens, 375 U.S. 162, 84 S.Ct. 295, 11 L.Ed.2d 224 (1963)). Although a defendant is not compelled to speak on his own behalf at sentencing, courts have long recognized the importance of affording him such an opportunity. The creation of various procedural *810 protections has not “lessened] the need for the defendant, personally, to have the opportunity to present to the court his plea in mitigation. The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself.” Green v. United States, 365 U.S. 301, 304, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961). At sentencing, “the test [of competency] is whether the defendant is able to understand the nature of the proceedings and participate intelligently to the extent participation is called for.” Chavez, 656 F.2d at 518 (9th Cir. 1981). The ability to allocute, in short, is an essential element of this participation.
At sentencing Dreyer refrained from allocuting. While the defendant has the right to make this choice, defense counsel explained the reason underlying Dreyer’s silence: his disease prevented him from coherently speaking on his own behalf. Counsel expressed concern that Dreyer might contradict himself by accepting responsibility and then refusing to do so, or would speak to the court inappropriately. He also explicitly informed the court that Dreyer had difficulty perceiving the truth as a result of his dementia and was only “partially with us.” The decision not to allocute was therefore obviously viewed by the defense as necessitated by Dreyer’s medical condition.
Although it is true that “defense counsel will often have the best-informed view of the defendant’s ability to participate in his defense,” Medina v. California, 505 U.S. 437, 450, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992), the district court need not have relied merely on the defense counsel’s statements to determine whether Dreyer’s competence was in question. Counsel’s assessment of Dreyer was supported by all three medical evaluations presented to the court. Although the medical experts described Dreyer as generally cooperative and articulate, they also found his behavior to be inappropriate, his personality emotionally-blunted, and his speech laced with sexual references and profanity. He was prone to lies and exaggerations due to his faulty judgment, insight and recall. Despite Dreyer’s apparent proclivity for falsehood, the experts observed that these statements were not made in a deliberate attempt to misrepresent the truth. Dreyer lacked an awareness of social norms of comportment and exhibited poor social judgment and a penchant for engaging in provocative and antagonistic behavior had already resulted in his receiving a severe beating during his brief prison stay. The experts explicitly recognized that Dreyer had a “profound lack of social propriety,” and an inability to “filter himself effectively.” They additionally noted that he was prone to making inflammatory religious and racial statements that conflicted with his long-held beliefs, and that, if incarcerated, he would need protective custody “essentially to protect him from himself.” As a result of his frontotemporal dementia, Dreyer was not only incapable of making a reasoned plea for leniency, but was unable to even refrain from making comments that were contrary to his own beliefs and that placed him in physical danger. The uncontradicted medical evidence before the district court supported counsel’s representation that Dreyer’s failure to allocute was compelled by his ailment and his resultant inability to regulate his speech or behavior in a manner that could assist in his defense. Given the consistency between counsel’s statements and the supporting expert reports, the district court had substantial evidence before it that should have created a reasonable doubt in its mind as to Dreyer’s ability to assist in his own defense, and thus as to his competency.
III.
The cases in which this court has concluded that there was no basis for the trial *811 court to doubt the defendant’s competency, including all those cited by the government, involve substantially less evidence to suggest incompetency than the case before us. For instance, in United States v. Mendez-Sanchez, 563 F.3d 935, 939-40 (9th Cir.2009), there was no diagnosis of any mental disorder or defect. The defendant was uncooperative with his attorneys, but when asked explicitly by the judge whether the defendant might be incompetent, defense counsel reported that they did not believe that he was. Id. at 941-42, 947-48. Instead, counsel told the court, the defendant’s difficulties were based solely on a refusal to accept facts which he did not like. Id. In Marks, 530 F.3d 799 (9th Cir.2008), the defendant was rude, asserted that the court lacked jurisdiction over him and was uncooperative with counsel. 530 F.3d at 814-815. Again, however, there was no medical diagnosis to suggest that the defendant might be incompetent, and his counsel did not alert the court to any possible difficulties. In Davis v. Woodford, 384 F.3d 628 (9th Cir.2004), the defendant refused to wear civilian clothes or sit at the counsel table. There was no medical evidence indicating any kind of ailment, nor did counsel assert that the defendant was incapable of assisting in his defense. Id. at 645-46. On appeal the defendant alleged only that “[t]he trial court judge was in a position to gauge whether a competency hearing would be in order,” but this court determined that his unusual behavior alone was insufficient to create a genuine doubt as to his competency, and that his actions reflected a reasoned choice. Id. at 646.
In all of these cases, there was only comparatively minor inappropriate courtroom behavior. There was no evidence that the defendant would be unable to understand or participate in the proceedings. In contrast to Dreyer’s sentencing proceedings, there were no statements by counsel or medical diagnoses that would have produced a genuine doubt as to the defendant’s competency in the mind of a reasonable judge. In fact, in these cases when medical evidence was presented, or defense counsel made a statement to the court regarding the defendant’s competence, the evidence supported a finding of competency. Here, the opposite is true. The court had a clear diagnosis of frontotemporal dementia from multiple sources, including one selected by the government, and all of the expert reports noted the defendant’s inability to regulate his behavior and speech as a result of this illness. The court also had counsel’s express statements that the defendant would not speak on his own behalf as a result of his medical condition. The cases cited by the government are therefore inapplicable.[3]
*812 When this court has considered a record containing expert diagnoses of a medical disorder bearing on the defendant’s mental state we have found this evidence sufficient to cause genuine doubt as to the defendant’s competency. See, e.g., Deere v. Woodford, 339 F.3d 1084, 1086-87 (9th Cir.2003); Odle v. Woodford, 238 F.3d 1084, 1088-89 (9th Cir.2001); Morris v. United States, 414 F.2d 258 (9th Cir.1969) (per curiam). Even in the absence of expert evidence, we have found cause to grant a motion for a competency hearing when defense counsel reported an attempted suicide by the defendant the night before trial. United States v. Loyola-Dominguez, 125 F.3d 1315 (9th Cir.1997). District courts to which such evidence is presented are obligated to determine only whether doubt has been created, not whether the defendant is competent or incompetent. In such cases that question can ordinarily be resolved only after an evidentiary hearing.
Although each case presents a unique set of facts, the case that involved the most comparable record before the district court is Duncan, 643 F.3d 1242 (9th Cir.2011).[4] In Duncan, the record before the district judge included five competing expert reports: two from court-appointed experts that found “no evidence of psychotic behaviors or thought processes,” id. at 1246, and three from defense experts that found that the defendant suffered from “severe psychosis,” id. at 1249, and were accompanied by a brain scan showing “unusual brain structure consistent with behavioral deficits in the ability to make rational plans and modulate emotions.” Id. at 1249. The record. also included letters written by the defendant, some of which “appear[ed] rational” while the others included statements that were “unusual.” Id. at 1250. Lastly, as evidenced by the motion for a competency hearing, counsel in Duncan also expressed a belief that the defendant was not competent. Id. at 1245. On review this court concluded that the evidence presented to the district court created a “reasonable doubt about the Defendant’s competence, such that § 4241(a) required a full competency hearing before the district court could reach a decision.” Id. at 1250.
The trial court here, as in Duncan, was faced with a record that included diagnoses of a medical disorder affecting the defendant’s mental condition and behavior. Although Dreyer’s counsel did not move for a competency hearing, he explicitly informed the court that his client’s disease prevented him from participating in his defense to the extent that further participation was called for. As in Duncan, we must therefore conclude that the evidence on the record was sufficient to create a reasonable doubt as to Dreyer’s competence and thus compelled the district court to order a competency hearing sua sponte.
The government primarily relies on Dreyer’s calm demeanor at sentencing to argue that the record was insufficient to create reasonable doubt as to his competence. Among the factors to consider when evaluating whether a court erred in failing to order a competency hearing sua sponte, are the “defendant’s irrational behavior, his demeanor at trial, and any prior medical opinion on competence,” Drope, 420 U.S. 162, 180, 95 S.Ct. 896 (1975), *813 however, “[n]one of these factors is determinative,” Miles, 108 F.3d 1109, 1112 (9th Cir.1997), and “even one of these factors standing alone may, in some circumstances, be sufficient.” Drope, 420 U.S. at 180, 95 S.Ct. 896. While the defendant’s courtroom behavior may provide insight into his mental condition, we have previously observed that a “judge may be lulled into believing that [the defendant] is competent by the fact that he does not disrupt the proceedings, yet this passivity may itself mask an incompetence to meaningfully participate in the process.” Odle, 238 F.3d at 1089. Here, according to the undisputed facts in the record, counsel’s decision that Dreyer should not allocute was “a strategy for controlling his behavior,” id. at 1089, n. 6; it was necessitated by a mental ailment, and was not proof of Dreyer’s competence. Dreyer’s condition, as described in detail by the three expert reports, did not manifest itself in violent outbursts, but instead prevented him from expressing himself appropriately or in a manner that could assist in his defense. Given the expert opinions that supported defense counsel’s representation that Dreyer was unable to assist in his defense due to his medical condition, the record creates a genuine doubt as to Dreyer’s competency even in the absence of observable court-room antics.
IV.
Given the substantial evidence of Dreyer’s lack of competency, we hold that the district court’s failure to order a competency hearing sua sponte constituted plain error. We vacate Dreyer’s sentence and remand for the district court to hold an evidentiary hearing.
“Although we generally remand for resentencing to the original district judge, we remand to a different judge if there are unusual circumstances.” United States v. Quach, 302 F.3d 1096, 1103 (9th Cir.2002) (citing United States v. Mikaelian, 168 F.3d 380, 387 (9th Cir.1999)) (internal quotation marks omitted). When making this determination we consider:
(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving appearance of fairness.
Id. (internal citation omitted). “The first two of these factors are of equal importance, and a finding of one of them would support a remand to a different judge.” United States v. Hanna, 49 F.3d 572, 578 (9th Cir.1995) (internal quotation marks and citation omitted). Both are present in this case. Because we conclude that the district judge would have difficulty setting aside her previously-expressed views as to Dreyer’s competency, and because reassignment is advisable to preserve the appearance of justice, we remand this case to a different judge for the completion of all further proceedings.
Here, the district judge, in a bail proceeding after Dreyer had already been sentenced, defended her failure to conduct an evidentiary hearing.at the time of sentencing.[5] In doing so, she substituted her lay evaluation of Dreyer’s behavior for the *814 opinions of the medical experts and misstated the express remarks of counsel in a manner that conformed with her own assessment of Dreyer’s mental condition.[6] She also failed to mention the diagnoses of frontotemporal dementia as a consideration in determining whether there was an issue as to Dreyer’s competence. Her only brief mention of the expert reports was to note that they did not establish that Dreyer was incompetent. Although she minimized the relevance of the medical reports, she explained that her own evaluation of Dreyer’s competency was substantially affected by his apparent reliance on his condition as a basis for seeking a lesser sentence. The statements by the district judge indicate that she has already determined, without the benefit of a hearing or a full consideration of the submitted medical evidence, that Dreyer is competent and that a full evidentiary hearing is unnecessary. She has also determined that Dreyer was using his claim of illness in an attempt to obtain a lesser sentence. All of these facts are on the public record. Given these facts, it is reasonable to expect that the judge would have difficulty putting out of her mind the previous assessment that she so vigorously defended, and reasonable to conclude that reassignment is advisable to preserve the appearance of justice. We therefore remand for an evidentiary hearing as to Dreyer’s competency to be held before a different judge.
VACATED and REMANDED.

. Dreyer's family recounted a number of instances in which he behaved in ways that *806 starkly contrasted with his pre-onset behavior. Among them was an instance when Dreyer appeared wearing dress slacks and nude from the waist up in the lobby of an expensive hotel to meet with his daughter and a family friend. His daughter also described Dreyer as behaving “detached and aloof' at her younger son's bar mitzvah, going so far as to read a newspaper in the temple while his grandson gave his speech. This was a marked contrast from her first son’s bar mitzvah, at which the defendant "was engaged, singing [and] shedding tears of joy/'

. At Dreyer's change of plea hearing, he informed the court that a doctor had identified frontal lobe damage in his brain. At the time, Dreyer's counsel made no comments regarding the effect of this condition on Dreyer’s ability to assist in his defense and the court did not have the benefit of any of these expert reports; all three reports were completed after Dreyer entered his guilty plea.

. A case relied on heavily in the dissent. United States v. White, 670 F.3d 1077 (9th Cir. 2012), is also inapplicable and presents an entirely different issue. In White, the issue presented was whether the district court committed error by failing to order a second competency hearing sua sponte after the court had previously conducted a hearing on the matter and found the defendant to be competent to stand trial. The court in White recognized that, where, as here, a hearing has not previously been held, the proper standard of review "is comprehensive and not limited by either the abuse of discretion or clearly erroneous standard,” and error occurs when the reviewing court determines that the evidence before the trial court "raises a bona fide doubt as to whether the defendant has become incompetent.” White, 670 F.3d at 1082 (internal citations and quotation marks omitted). Where, as in White, a competency hearing has already been conducted and in that hearing the defendant has been found competent, White holds that the standard of review is more deferential and error can be found only if the failure to order a second hearing sua sponte constitutes an abuse of discretion. Id. In Dreyer’s case, there was no prior hearing as to his competency, and thus we must conduct, as White reaffirms, a "comprehen *812 sive [review] not limited by either the abuse of discretion or clearly erroneous standard.” Id.

. Although Duncan involved the district court's decision not to hold a formal competency hearing despite defense counsel's mo-lion, on appeal the analysis is the same: "whether a reasonable judge, situated as was the trial judge who denied the motion, should have experienced doubt with respect to the defendant's competence.” Duncan, 643 F.3d at 1247.

. We take judicial notice of the June 20, 2011 hearing. U.S. v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980); see also United States v. Howard, 381 F.3d 873, 876, n. 1 (9th Cir.2004). The Appellant's motion to strike the portion of the government’s brief and excerpt of records that refers to this hearing is therefore denied as moot.

. The dissent asserts that the district court’s "considerable experience with Dreyer and his counsel” weighs against reassignment, and points to a statement purportedly made by Dreyer’s counsel asserting that Dreyer was manipulative and cunning as somehow relevant to that conclusion. To the contrary, the statement cited by the dissent — which was made by the district court, not defense counsel — further illustrates how the district court attempted to justify its decision by misconstruing statements made by the defense, and supports our decision to reassign. At the June 20, 2011 hearing, the court incorrectly imputed to counsel the description of Dreyer as "intelligent ... cunning and manipulative,” as well as the statement that Dreyer would be "running the prison if he is sentenced to incarceration because of his exceptional abilities.” The record from the sentencing hearing reflects that these were not the representations of the defense counsel. To the contrary, counsel argued that Dreyer would be at risk by placing him in either a prison or a federal medical facility because, due to his illness, Dreyer would engage in inappropriate behavior, which would likely render him a target of the violent acts of other inmates. Counsel asserted that placing Dreyer in a facility would result in him being "beaten to death or shanked ... or placed in isolation, which will accelerate the deterioration.” He stated that such placement may also "mess up the facility, because Dr. Dreyer, based on this injury that he has, will tty to reorganize the facility.” In defense counsel’s view, the threat to the facility posed by Dreyer was not, as the district court recalled, based on his "cunning and manipulative” nature, but rather a consequence of Dreyer’s uncontrollably inappropriate behavior.